**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| SCION HOTELS LLC, | : | |
| | : | |
| Plaintiff, | : | **Civil Action No. 21-2276 (JXN) (MAH)** |
| | : | |
| v. | : | **OPINION** |
| | : | |
| HOLIDAY HOSPITALITY | : | |
| FRANCHISING, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**NEALS**, District Judge:

This matter comes before the Court on Defendant Holiday Hospitality Franchising, LLC's ("Defendant's") motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 and L. Civ. R. 56.1. (ECF No. 51). Plaintiff Scion Hotels, LLC ("Plaintiff") opposed (ECF No. 59) ("Pl.'s Opp."), and Defendant replied. (ECF No. 70) (the "Reply"). Jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1332(a) and 1391, respectively. The Court has carefully considered the parties' submissions and decides this matter without oral argument under Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons set forth below, Defendant's motion for summary judgment (ECF No. 51) is **GRANTED**, and Plaintiff's amended complaint (ECF No. 11) (the "Amended Complaint") is **DISMISSED with prejudice**.

## I.      BACKGROUND AND PROCEDURAL HISTORY

On April 9, 2021, Plaintiff filed the Amended Complaint alleging the following violations of the New Jersey Franchise Practices Act ("the NJFPA"), N.J.S.A. § 56:10-1, *et seq.*: (1) wrongful non-renewal (Count One); (2) constructive termination (Count Two); and (3) unreasonable standards of performance (Count Three). The relevant facts follow.

Defendant "owns and franchises numerous hotel brands" including the "Holiday Inn® and Holiday Inn Express® brands." (Def.'s Statement of Undisputed Material Facts (ECF No. 52) ("SSOF")[1] ¶ 1; Pl.'s Resp. Statement of Undisputed Material Facts (ECF No. 60) ("PRSOF") ¶ 1). Defendant "franchises Holiday Inns and Holiday Inn Express hotels separately, under distinct and different trademarks[.]" (Pl.'s Suppl. Statement of Undisputed Material Facts (ECF No. 61) ("PSOF") ¶ 3; Def.'s Resp. Statement of Undisputed Material Facts (ECF No. 71) (the "DRSOF") ¶ 3). These are "two different types of hotels" that have "different price points and directed at different markets." (PSOF ¶ 3; DRSOF ¶ 3). This action concerns both Hilton hotel brands.

### A. Plaintiff Purchases the Newark Hotel and Enters a Change in Ownership Franchise Agreement with Defendant

In 2019, Plaintiff's "principal owner and manager[,]" Jatin Batra ("Batra"), was interested in purchasing the franchised Holiday Inn® hotel near Newark Liberty International Airport in Newark, New Jersey (the "Newark Airport"). (SSOF ¶¶ 5, 11; PRSOF ¶¶ 5, 11). Because the Newark Hotel was under an "existing franchise agreement that had 2 years remaining on its term," Plaintiff expressed its "intent to sign the" Newark Hotel's "limited-term agreement." (SSOF ¶ 11; PRSOF ¶ 11); (PSOF ¶ 23; DRSOF ¶ 23).

On June 4, 2019, Plaintiff "executed the 22-month remaining term Holiday Hospitality Franchising LLC Holiday Inn Hotel Change of Ownership License Agreement with Scion Hotels LLC" for the Newark Hotel (the "Franchise Agreement"). (SSOF ¶ 35; PRSOF ¶ 35). The Franchise Agreement reads in part that this "License is not renewable, and Licensee acknowledges and agrees that this License confers upon Licensee absolutely no rights of franchise renewal following the expiration of the License Term." (SSOF ¶ 37; PRSOF ¶ 37).

---

[1] For brevity, all citations to the parties' Rule 56.1 statements incorporate the evidentiary citations contained therein.

**B.**   **<u>Defendant Seeks a Long-Term Franchise Agreement for the Newark Hotel</u>**

On February 14, 2019, Alex Moeckel ("Moeckel"), Defendant's "Director of Development[,]" asked Batra whether he required a "Property Improvement Plan" ("PIP") for a "Holiday Inn® or Holiday Inn Express® brand. . . ."  (SSOF ¶¶ 2, 12-13; PRSOF ¶¶ 2, 12-13).  In response, Batra stated Plaintiff would "contemplate" whether to keep the Newark Hotel as a Holiday Inn® or convert it to a Holiday Inn Express® during the duration of the Franchise Agreement.  (SSOF ¶ 13; PRSOF ¶ 13).  Moeckel in turn stated it is Defendant's "intent to have both a Holiday Inn Express" and a "Holiday Inn within the Newark Airport market" and confirmed that Plaintiff is "requesting [a] remaining term change of ownership franchise agreement as a Holiday Inn)[.]"  (SSOF ¶ 21; PRSOF ¶ 21).  Moeckel further noted:

> That said, what you are requesting ([a] remaining term change of ownership franchise agreement as a Holiday Inn) would not require a PIP, rather what is considered a deficiency list (DL). There are no guarantees that either the Holiday Inn, nor Holiday Inn Express flag will be available following the expiration of the in-place franchise agreement. . . .

(SSOF ¶ 21; PRSOF ¶ 21).

On April 18, 2019, Moeckel reiterated to Batra, Defendant's "intent to have representation of both the Holiday Inn Express and Holiday Inn brands within the Newark Airport market." (SSOF ¶¶ 23-24; PRSOF ¶¶ 23-24).  Also, Defendant's "intent to work with" Batra on "evaluat[ing] conversion of the" Newark Hotel "to a Holiday Inn Express and work through replacement of the Holiday Inn brand elsewhere."  (SSOF ¶ 24; PRSOF ¶ 24) (emphasis removed).

Batra did not "request a full-term Holiday Inn® Franchise Agreement" prior to Plaintiff's "execution of its remaining term Holiday Inn® Franchise Agreement. . . ."  (SSOF ¶ 34; PRSOF ¶ 34).  As a result, Moeckel stated in a May 22, 2019 email that Defendant "understand[s]" Plaintiff is "not interested in a longer-term franchise for either the Holiday Inn or the Holiday Inn Express

brand" and that Defendant is "actively pursuing opportunities for long-term deals for both[,]" including "actively discussing the conversion of the Ramada Plaza by Wyndham Newark International Airport" to a "Holiday Inn branded hotel." (SSOF ¶ 31; PRSOF ¶ 31). In response, Batra stated "it's not as if I am not interested at all" but "want to take the time to sit down with [Moeckel] to have a conversation on a detailed scale." (SSOF ¶ 32; PRSOF ¶ 32).

### C.   **Plaintiff Rejects Defendant's Proposals for the Newark Hotel and Defendant Contracts with Ramada Plaza® Hotel to Become a Holiday Inn® Hotel**

On February 28, 2019, Moeckel "contacted the owners of the Ramada Plaza [("Ramada Plaza")] to determine whether they had any interest in converting the Ramada Plaza to a Holiday Inn® hotel[,]" who "agreed" to the conversion. (SSOF ¶¶ 42, 47; PRSOF ¶¶ 42, 47). On April 22, 2019, Ramada Plaza "submitted a franchise application to [Defendant] for conversion of the Ramada Plaza to a Holiday Inn®." (SSOF ¶ 47; PRSOF ¶ 47).

On May 2, 2019, Moeckel emailed Plaintiff a "proposal to convert the [Newark] Hotel to a Holiday Inn Express®." (SSOF ¶ 25; PRSOF ¶ 25). "In August and December 2019," Moeckel also provided Batra "terms pursuant to which [Batra] might agree to convert the [Newark] Hotel to a Holiday Inn Express®" or an "Atwell Suites® branded hotel[,]" which Batra rejected. (SSOF ¶ 55; PRSOF ¶ 55).

On June 10, 2019, Defendant approved "Ramada Plaza['s] application" to "replace[]" the Newark Hotel. (SSOF ¶ 52; PRSOF ¶ 52). On October 17, 2019, Defendant and Ramada Plaza entered a franchise agreement, and Ramada Plaza opened the "Ramada Holiday Inn" on December 20, 2019. (SSOF ¶ 53; PRSOF ¶ 53).

**D.    Plaintiff Negotiates with Hilton Worldwide to Convert the Newark Hotel to a Hampton Inn®**

Batra "began negotiations with Hilton Worldwide on August 7, 2019 (less than **two months** after [] Batra signed his Holiday Inn® Franchise Agreement)" and "signed a Hampton Inn® Franchise Agreement on November 12, 2020, . . . five months before the expiration of Scion's Holiday Inn® Franchise Agreement." (SSOF ¶ 38; PRSOF ¶ 38).[2] From August 7, 2019, to November 12, 2020, Plaintiff and Hilton Worldwide representatives exchanged the following emails in the negotiations related to a franchise agreement to convert the Newark Hotel to a Hampton Inn®:

a.    . . . (August 7, 2019): This email between Robert Giardino (Hilton Senior Director of Development-Northeast) and Mr. Batra refers to their discussion . . . concerning the potential conversion of the [Newark] Hotel and potential conversion of Mr. Batra's Holiday Inn® in Wilkes-Barre, Pennsylvania.

b.    . . . (November 26, 2019): This email between Mr. Giardino and Mr. Batra in November 2019 concerns the status of negotiations concerning the conversion of the [Newark] Hotel, as well as Mr. Batra's Wilkes-Barre Holiday Inn®. In these conversations, in which Mr. Batra confirms his interest in converting both properties to Hilton, he states that "NJ [the Hotel] will be an aggressive conversion. Hoping to take it live by mid-2021, if not earlier. Wilkes – we will have to ride through the agreement (mid-2024) but will start the work on the PIP, effective immediately. Attached is what I have in writing with IHG as they want to keep both. Marriot and Hyatt are in play but my inclination is with Hilton – with my love for Hilton."

c.    . . . (December 3, 2019): Email between Hilton's Mr. Giardino and Mr. Batra, in which Mr. Giardino states: "Hey there. Just got from our legal group they're still in court with the old Hampton Newark. There is a slight chance this one might remain in the system and I'll know more this month. We're still moving forward with your application to add a second one calling Newark Airport North."

---

[2] Plaintiff disputed certain portions of ¶ 38 but did not dispute the dates that negotiations with Hilton began or the date that Batra signed a Hampton Inn® franchise agreement.

d.      . . . (December 17, 2019): Email from Hilton to Mr. Batra confirming Mr. Batra's submission of his application for the potential conversion of the Hotel to a Hampton Inn by Hilton, requesting additional documentation and payment of the application fee.

e.      . . . (June 3, 2020): Letter from Mr. Batra to Mr. Giardino expressing disappointment and concern about the negotiations, Hilton's other negotiations in the marketplace, and Mr. Batra's commitment of "a large portion of our existing portfolio to the Hilton family of brands."

f.      . . . (August 22, 2020): Mr. Giardino informs Mr. Batra that Hilton is involved in litigation with the owner of the then-current Hampton Inn Newark and, because there was no movement in the court in that litigation, Mr. Giardino offers to refund the application fee in connection with the potential conversion of the Hotel to a Hampton Inn. Mr. Giardino also recommends that Mr. Batra pursue the Hyatt opportunity that they have previously discussed, and there is no mention of continuing to operate the Hotel as a Holiday Inn® after its expiration date.

g.      . . . (September 14, 2020): Hilton's Mr. Giardino sends a letter to the Hilton Franchise Approval Committee concerning the conversion of the Hotel to a Hampton Inn, noting that: "We initially received this application in January. However, due to an objection from the Hilton full-service Newark Airport property, the project was put on hold. … Through litigation, the existing 151 key Hampton Inn Newark Airport is expected to leave the system on 3/31/2021."

h.      . . . (September 24, 2020): Email from Mr. Giardino to Mr. Batra in which Mr. Giardino advises Mr. Batra that his conversion application was approved by Hilton and outlining the next steps toward the execution of a Hampton Inn franchise agreement.

i.      . . . (November 12, 2020): Franchise Agreement between Hilton Franchise Holdings LLC and Scion Hotels, LLC for Hampton Inn by Hilton Newark Airport North Route 1 (Newark, New Jersey), executed on November 12, 2020. . . .

(SSOF ¶ 40; PRSOF ¶ 40).

Batra's "Hampton Inn® franchise agreement" called for Batra "to begin renovations to convert the [Newark] Hotel to a Hampton Inn® in March 2021. . . ."  (SSOF ¶ 39; PRSOF ¶ 39). However, "nearly a year after he entered into negotiations with [Defendant] about converting the

[Newark] Hotel to a Hampton Inn®[,]" on July 29, 2020, Batra asked Defendant if it "would offer him a six-to-eight-month extension on his Franchise Agreement, . . . to help him [] decide what to do with the [Newark] Hotel[,]" which Defendant rejected.  (SSOF ¶¶ 56-57; PRSOF ¶¶ 56-57). Plaintiff was unable to "complete the Hilton PIP renovation in the anticipated timeframe, and ultimately did not complete the renovation and open the [Newark] Hotel as a Hampton Inn until late May 2022."  (SSOF ¶ 41; PRSOF ¶ 41).

### E.   The Holiday Inn Franchise Agreement Expires and the Newark Hotel Opens as a Hampton Inn®

On January 4, 2021, Defendant sent Plaintiff a letter "providing notice that the License Agreement would expire on April 11, 2021."  (SSOF ¶ 59; PRSOF ¶ 59).  On January 17, 2021, Defendant sent Plaintiff a second letter "confirming the expiration of the License Agreement on April 11, 2021. . . ."  (SSOF ¶ 60; PRSOF ¶ 60).  On April 11, 2021, the Newark Hotel "closed[,]" was "renovat[ed][,]" and "opened as" a Hampton Inn® in May 2022.  (SSOF ¶ 61; PRSOF ¶ 61).

On April 28, 2023, Defendant filed the motion for summary judgment.  On May 26, 2023, Plaintiff opposed.  On June 16, 2023, Defendant replied.  This matter is now ripe for consideration.

## II.   LEGAL STANDARD

Summary judgment is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party[;]" and "is material only if it might affect the outcome of the suit under governing law."  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citation omitted). The moving party bears the "initial responsibility" of demonstrating the "absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party "must [then] counter with specific facts which demonstrate that there exists a genuine issue for

trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citation omitted). There can be "no genuine [dispute] as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence. . . ." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citation omitted). Rather, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party." *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citation omitted). And credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Thus, the court's role is "to determine whether there is a genuine [dispute] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.  DISCUSSION

### A.  The Wrongful Non-Renewal Claim (Count One)

Plaintiff claims Defendant did not have good cause to terminate the Franchise Agreement and issues of fact preclude summary judgment. (Pl.'s Opp. at 28-39). Defendant argues summary judgment should be granted because Count One lacks factual and legal support. (((ECF No. 53) (the "Mem. of Law") at 22-39[3]). The Court agrees and dismisses Count One with prejudice.

Defendant presents the following arguments in asserting Plaintiff's wrongful non-renewal claim is without factual or legal basis: (i) the NJFPA does not require a franchisor to offer renewal where a franchise agreement expressly states that it is non-renewable; (ii) no court has ruled that a franchise agreement that contains express non-renewable language must nevertheless be

---

[3] The Court refers to the ECF page numbers in this Opinion.

renewed; (iii) judicial dicta requiring good cause for nonrenewal of a franchise agreement is not controlling or persuasive; and (iv) Plaintiff had no ability to enter into a renewal agreement with Defendant because it signed a Hilton Franchise Agreement. (*See gen.* Mem. of Law at 44).

In enacting the NJFPA, the "New Jersey [L]egislature aimed to remedy a historic imbalance of power in the world of franchisor-franchisee relations, by protecting innocent franchisees against indiscriminate terminations and nonrenewals. . . ." *Ocean City Express Co., Inc. v. Atlas Van Lines, Inc.*, 194 F. Supp. 3d 314, 321 (D.N.J. 2016) (internal quotation marks and citation omitted). The NJFPA addressed "unreasonable termination[s] by franchisors" due to a "disparity of bargaining power between national and regional franchisors and small franchisees." N.J.S.A. § 56:10-2. To that end, the NJFPA protects "franchisees who have conscientiously striven to carry out their obligations under the franchise agreement" and is "not intended to prevent the severance of those who deliberately disregard reasonable requirements contained in their contract with the franchisor." *Amerada Hess Corp. v. Quinn,* 143 N.J. Super. 237, 253 (N.J. Super. Ct. 1976); *see also Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.,* 100 N.J. 166, 178 (1985) (NJFPA "does not compensate those franchisees who have lost their franchises as a result of their own neglect or misconduct.").

### 1. The Non-Renewal Provision

Defendant asserts "there is nothing in the plain language" of the NJFPA that "deems it a violation of the" statute for a "franchisor to not renew a franchise agreement which expressly states that it may not be renewed[.]" (Mem. of Law 24-25). New Jersey courts consistently give effect to the plain meaning of the NJFPA. *See, e.g., Dunkin' Donuts of Am., Inc.*, 100 N.J. at 178 (Franchisee's attempt to defraud franchisor amounts to good cause under the plain language of

the NJFPA).  Indeed, the NJFPA requires notice and good cause prior to terminating a franchise. N.J. Stat. § 56:10-5.

Here, the parties do not dispute that Defendant provided Plaintiff with notice.  (PSOF ¶ 41; DRSOF ¶ 41; SSOF ¶¶ 59-60; PRSOF ¶¶ 59-60).  Plaintiff argues that the NJFPA requires that such notice "refer" or "identify" any "good cause" to terminate the Franchise Agreement.  (Pl.'s Opp. at 26-27).  The statute does not expressly require such, and Plaintiff proffered no authority to this effect.  *See* (*Id.* at 26-27).  Accordingly, the Court finds the notice to be sufficient, and moves to analyzing the Franchise Agreement's non-renewal provision.

 It is a violation under the NJFPA "for a franchisor to terminate, cancel or fail to renew a franchise without good cause."  N.J. Stat. § 56:10-5.[4]  Good cause means the franchisee's "failure" to "substantially comply with those requirements imposed upon him by the franchise."  N.J. Stat. § 56:10-5.  To be sure, good cause is "similar to the legal concept of material breach. . . ."  *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F. 4th 622, 631 (3d Cir. 2024) (citations omitted).

"Substantial compliance is [] something less than absolute adherence to every nuanced term of an agreement, but . . . requires that the franchisee refrain from acting in direct defiance of a term of the agreement."  *Red Roof Franchising, LLC v. Patel*, 877 F. Supp. 2d 124, 138 (D.N.J. 2012) (internal quotation marks, brackets, and citation omitted).  The NJFPA's "statutory definition of 'good cause' focuses solely on the objective actions of the franchisee—i.e., whether the franchisee substantially complied with franchise requirements—and *not* on the subjective motivations of the franchisor—i.e., whether the franchisor's decision was undertaken in bad faith." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 320 n.11 (3d Cir. 2001).

---

[4] There are only "two limited circumstances" where good cause is not needed: (1) "voluntary abandonment by the franchisee of the franchise relationship[;]" and (2) "conviction of the franchisee in a court of competent jurisdiction. . . ." *Kumon N. Am., Inc. v. Timban*, No. 13-4809, 2014 WL 2812122, at *5 and n.2 (D.N.J. June 23, 2014) (quoting N.J. Stat. § 56:10-5).

While a non-renewal provision, standing alone does not trigger a violation, it may demonstrate non-substantial compliance. *See Mall Chevrolet, Inc.*, 99 F. 4th at 631(Courts assess whether the facts establish a "material breach of a franchise agreement" to "constitute[] good cause for termination of a franchise" on summary judgment) (citations omitted). Accordingly, the enforceability of a non-renewal provision is dependent upon a good cause analysis of the underlying facts rather than the provision's terms. *See id.*

Defendant argues no court has held that the NJFPA "requires renewal of a franchise agreement when the franchisee expressly was advised or understood that its own election to sign a short-term agreement would very likely make a renewal thereafter unavailable." (Mem. of Law at 25). Further, that "[f]ifteen other states and two territories [] enacted franchise 'relationship' laws which, like New Jersey's, prohibit franchise nonrenewal expect for 'good cause[,]'" none of which require renewal when the franchise agreement specifically provides for non-renewal. (*Id.* at 38-39). Here, the Court is guided by the NJFPA, New Jersey, and Third Circuit precedent, which provide for a violation for failure to renew without good cause (*see, e.g. BP Products North America, Inc. v. Hillside Service, Inc.*, No. 9-4210, 2011 WL 4343452, at *1-2, 4 (D.N.J. Sept. 14, 2011)). Indeed, the NJFPA does not require that a franchisor make a "renewal offer" prior to termination. Accordingly, any claim based on non-renewal is, in effect, a claim that a franchisor did not have good cause for the non-renewal.

## 2.    Plaintiff Did Not Substantially Comply with the Franchise Agreement

In *Dunkin' Donuts Franchising LLC v. C3WAIN Inc.*, the court "granted summary judgment in Dunkin's favor on Franchisees' NJFPA counterclaim" because "Dunkin' sent written notice" to the owner of the franchisee "informing him" that he "breached the express contract provision that prohibited fraudulent conduct." 677 F. App'x 779, 785 n.7 (3d Cir. 2017) (citations

omitted).  Similarly, in *General Motors Corp. v. Gallo GMC Truck Sales, Inc.*, this court noted that "since the franchisee had not breached the terms of the franchise agreement, the franchisor's termination of that franchise lacked good cause, and was therefore in violation of the plain meaning of the Franchise Practices Act."  711 F. Supp. 810, 816 (D.N.J. 1989) (citation omitted).  In viewing the record in the light most favorable to Plaintiff, Defendant had good cause for the non-renewal of the Franchise Agreement.

Defendant contends that Batra "had no ability to accept a renewal because he had already executed a Hampton Inn® franchise agreement related to the [Newark] Hotel. . . ."  (Mem. of Law at 9).  In opposition, Plaintiff argues that it "had no choice but to sign" the Hampton Inn® franchise agreement because Defendant "repeatedly" refused Plaintiff's request for a renewal.  (Pl.'s Opp. at 59).  The Court disagrees.

It is undisputed that Plaintiff requested a "six-to-eight-month extension" of the Franchise Agreement" only once on July 29, 2020, which was "nearly a year after [Plaintiff] entered into negotiations with [Hilton] about converting the [Newark] Hotel to a Hampton Inn®. . . ."  (SSOF ¶¶ 56-57; PRSOF ¶¶ 56-57).  Indeed, Plaintiff actively engaged in negotiations with Hilton Worldwide and, to that end, exchanged at least nine separate emails from August 2019 to November 2020 regarding conversion of the Newark Hotel to a Hampton Inn®.  (SSOF ¶ 40; PRSOF ¶ 40).  Consequently, Plaintiff entered the Hampton Inn® franchise agreement, which conflicted with Plaintiff's duties under the Franchise Agreement with Defendant.  (*See* Mem. of Law at 37) (The parties' Franchise Agreement and Plaintiff's Hampton Inn® franchise agreement, are "completely contradictory and it would not be possible for [Plaintiff] to perform under both.").  Under these facts, Plaintiff failed to substantially comply with the Franchise Agreement.

Courts "have held that a franchisee was not in substantial compliance with the terms of the franchise agreement when it operated a franchise of another automobile manufacturer without the prior consent of the franchisor. . . ."  *Maple Shade Motor Corp. v. Kia Motors of Am., Inc.,* 384 F. Supp. 2d 770, 775 (D.N.J. 2005), *aff'd sub nom., Maple Shade Motor Corp. v. Kia Motors Am., Inc.,* 260 F. App'x 517 (3d Cir. 2008) (citing *Gen. Motors Corp. v. Kia Motors of Am., Inc.*, 91 F. Supp. 2d 733, 740 (D.N.J. 2000)).  Courts have further held that substantial compliance was lacking where a franchisee "violated federal gas pricing regulations by overcharging its customers" (*Id.* at 775) (citing *Amerada Hess Corp.,* 143 N.J. Super. at 253-55)) and "underreported sales to the franchisor in order to avoid paying fees and taxes. . . ."  (*Id.* at 775) (citing *Dunkin' Donuts of Am., Inc.,* 100 N.J. at 179)).

Further, the Third Circuit in *Maple Shade Motor Corp. v. Kia Motors Am., Inc.* upheld summary judgment rulings under similar facts.  There, the court found that the "District Court did not err in granting summary judgment in favor of" franchisor because franchise agreement "expressly stated [franchisee's] obligation to build an exclusive Kia showroom was a material term of the parties' agreement."  260 F. App'x 517, 518 (3d Cir. 2008).  "By failing to construct the exclusive Kia showroom required by" the agreement, franchisee "committed a material breach of the franchise agreement and gave rise to [franchisor's] good cause termination of the franchise agreement."  *Id.* at 518.  Here, the record demonstrates that Plaintiff committed only to the Newark Hotel's existing 22-month franchise agreement and, when the Franchise Agreement expired, planned to repurpose the Newark Hotel as a Hampton Inn® hotel.

Batra knew in 2019 that the Newark Hotel was under an existing Holiday Inn® franchise and sought only a "change of ownership" franchise agreement that would expire within two years. (SSOF ¶¶ 5, 11, 28-29; PRSOF ¶¶ 5, 11, 28-29).  From April 2019 to May 2019, Moeckel

attempted to work with Batra on a long-term agreement for the Newark Hotel to continue as a Holiday Inn® or Holliday Inn Express® after the Franchise Agreement expired.  (SSOF ¶¶ 23-25, 55; PRSOF ¶¶ 23-25, 55).  Moeckel also shared Defendant's "intent to work with" Batra on these brands.  (SSOF ¶ 24; PRSOF ¶ 24).

Three months before Plaintiff shared with Defendant its "intent to sign" the Newark Hotel's limited-term agreement[,]" on May 6, 2019, Moeckel asked Batra whether Plaintiff would like to continue with the Holiday Inn® or Holiday Inn Express® brand after the Franchise Agreement expired in 2021.  (SSOF ¶¶ 2, 12-13, 21; PRSOF ¶¶ 2, 12-13, 21); (PSOF ¶ 23; DRSOF ¶ 23).  Batra told Moeckel that Plaintiff would "contemplate" whether to do so during the length of the Franchise Agreement, which caused Moeckel to inform Batra "there are no guarantees" that either hotel brand would be available.  (SSOF ¶¶ 13, 21; PRSOF ¶¶ 13, 21).  Batra also did not sign a "full-term Holiday Inn® Franchise Agreement" prior to Plaintiff's "execution of its remaining term" Franchise Agreement.  (SSOF ¶ 34; PRSOF ¶ 34).  It is further undisputed that Batra negotiated a rival franchise agreement with Hilton Worldwide after entering, and before concluding, the 22-month term franchise agreement with Defendant.  (SSOF ¶ 38; PRSOF ¶ 38).

Under these facts, Defendant had good cause for not renewing the Franchise Agreement.  *See Red Roof Franchising, LLC*, 877 F. Supp. 2d at 138 (Substantial compliance "requires that the franchisee refrain from acting in direct defiance of a term of the agreement.") (internal quotation marks, brackets, and citation omitted).  Indeed, Plaintiff's actions demonstrate a lack of substantial compliance with the Holiday Inn franchise agreement and, arguably, Plaintiff's voluntary abandonment of the franchise relationship by actively pursuing a rival franchise relationship with Hilton. *See Kumon N. Am., Inc.*, 2014 WL 2812122, at *5 and n.2 (quoting N.J. Stat. § 56:10-5).  Accordingly, the Court dismisses Count One with prejudice.

### B.    The Constructive Termination Claim (Count Two)

Defendant asserts in relevant part that: (i) Plaintiff knew of Defendant's efforts to secure the Ramada Hilton Inn; and (ii) the Franchise Agreement was not constructively terminated prior to April 11, 2021, because the Newark Hotel did not cease to exist.[5]  In opposition, Plaintiff contends Defendant provides no authority to dismiss the claim.  (Pl.'s Opp. at 39-41).  Because Plaintiff has not alleged sufficient facts to support a constructive termination claim, the Court dismisses Count Two with prejudice.

Defendant relies largely on *Mac's Shell Service v. Shell Oil Prods. Co.*, 559 U.S. 175 (2010). (Mem. of Law at 39-41).  There, the Supreme Court addressed the Petroleum Marketing Practices Act (the "PMPA"), 92 Stat. 322, 15 U.S.C. § 2801, *et seq*., which "limits the circumstances in which petroleum franchisors may 'terminate' a franchise or 'fail to renew' a franchise relationship." *Mac's Shell Service*, 559 U.S. at 177 (citing 15 U.S.C. § 2802).  In that case, franchisees sued under the PMPA, "alleging that a franchisor had constructively terminated their franchises and had constructively failed to renew their franchise relationships." *Id.* at 177 (internal quotation marks and brackets omitted).

The court held that "a franchisor may 'terminate' a 'franchise' during the term stated in the franchise agreement and may 'fail to renew' a 'franchise relationship' at the conclusion of that term only if the franchisor provides written notice and takes the action in question for a reason specifically recognized in the statute." *Id.* at 178 (citing 15 U.S.C. §§ 2802, 2804).  The court further held that "a franchisee cannot recover for constructive termination under the PMPA if the franchisor's allegedly wrongful conduct did not compel the franchisee to abandon its franchise."

---

[5] Plaintiff cites *SAT Agiyar, LLC v. 7-Eleven, Inc.*, No. 19-19994, 2021 WL 5205941 (D.N.J. Nov. 8, 2021); *Pai v. DRX Urgent Care, LLC*, No. 13-4333, 2014 WL 837158 (D.N.J. Mar. 4, 2014).  (Mem. of Law at 41 n.65, 67).

*Id.* at 178.   The court explained that "[c]onduct that does not force an end to the franchise, in contrast, is not prohibited by the Act's plain terms."  *Id.* at 183.

In analyzing *Mac's Shell Service, Inc.*, the Third Circuit has held that the case "is not controlling authority for interpreting" the NJFPA.  *Fabbro v. DRX Urgent Care, LLC,* 616 F. App'x 485, 489 (3d Cir. 2015).   The court further noted that "the distinction" as to "constructive termination claims, is without a difference."  *Id.* at 489.   To that end, we first look to the statute.

In the absence of a substantial failure of franchisee compliance, the statutory requirement of "good cause" prohibits a franchisor from terminating for other reasons, even if they reflect a sound and nondiscriminatory business strategy.  *Westfield Centre Service, Inc.*, 86 N.J. at 460-61; *accord Cooper Distrib. Co.*, 180 F.3d at 545.   "The only express limitation on the franchisor's requirements is that the franchisor may not 'impose unreasonable standards of performance.'" *Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.,* 408 N.J. Super. 461, 475 (N.J. Super. Ct. App. Div. 2009) (citation omitted).

In *Maintainco, Inc.*, the defendant constructively terminated plaintiff's franchise because it "intend[ed] to terminate plaintiff once defendant found" another car dealership, "stop[ped] providing [plaintiff] annual business plans[,]" and "expected to abandon plaintiff in favor of another dealer."  408 N.J. Super. at 478.   The context for that holding was the court's inquiry into "whether the record supports the trial court's finding that defendant's conduct breached the franchise agreement and constituted an attempt to terminate the contract."  *Id.* at 465.   The court found constructive termination because "defendant's conduct was geared to terminating plaintiff's

[forklift] franchise" and absent that action, "defendant would have succeeded." *Id.* at 475.[6]  This case presents distinguishable facts.

Here, Plaintiff alleges "Defendant's unilateral decision to license the Ramada Plaza as a full-service Holiday Inn, combined with its subsequent decision to license another hotel as a Holiday Inn Express foreclosed the market for Holiday Inns at Newark Airport and constructively terminated its franchise agreement."  (Am. Compl. ¶ 22).  Further, Defendant "constructively terminat[ed]" Plaintiff's "franchise by placing" the Ramada Hilton Hotel "in unreasonable proximity to" the Newark Hotel.  (*Id.* ¶ 1).  The claim fails on this record.

Plaintiff cites several cases where courts purportedly found constructive termination.  (Pl.'s Opp. at 39-40).  These cases are factually and legally distinguishable as all involve motions for preliminary injunction and none held that the NJFPA allows a claim for constructive termination. In its opposition, Plaintiff argues that the court in *Carlos v. Philips Business Sys., Inc.,* examined "reorganization of a sales company so as to change exclusive distributions to nonexclusive dealerships[,]" but while it analyzed the NJFPA, it did not consider whether the statute permits constructive termination.  556 F. Supp. 769 (E.D.N.Y. 1983), *aff'd* 724 F.2d 1432 (2d Cir. 1983). (*Id.* at 39-40).  Similarly, *Sarwari v. BP Prods. N.A., Inc.,* involved "the restructuring of a gasoline station from a commission-based arrangement to a lessee relationship" where constructive termination was not considered.  2006 U.S. Dist. LEXIS 65987 (D.N.J. Sept. 15, 2006) (*Id.* at 40). And *Beilowitz v. General Motors Corp.,* involved "a change in marketing strategy" that did not analyze a constructive termination claim under the NJFPA.  233 F. Supp. 2d 631 (D.N.J. 2002).

---

[6] The court also "reject[ed] defendant's position that if plaintiff wanted to claim damages under the Act for termination[,] it was required to withdraw from the agreement and thus allow itself to be 'terminated.'" *Id.* at 478-79. Holding that "[s]uch a requirement would fly in the face of the Act's purposes of leveling the playing field between the typically more powerful franchisor and less powerful franchisee, and providing measures to protect franchisees from oppressive conduct by franchisors." *Id.* at 479 (citation omitted).

There are also a line of cases holding that a "claim for constructive termination by a franchisee requires that a franchisee no longer be in operation." *SAT Agiyar, LLC*, 2021 WL 5205941, at *6 (internal quotation marks and citations omitted); *see also Naik v. 7-Eleven, Inc.*, No. 13-4578, 2014 WL 3844792, at *13 (D.N.J. Aug. 5, 2014) (same).  The court in *Pai v. DRX Urgent Care, LLC*, No. 13-4333, 2014 WL 837158 (D.N.J. Mar. 4, 2014), analyzed *Mac's Shell Service*, and explained that to assert constructive termination, a plaintiff must first "abandon their franchise" because "constructive" in that context means that plaintiff "formally puts an end to the particular legal relationship, as opposed to the defendant."  2014 WL 837158, at *7.  In rejecting plaintiffs' assertion that the federal statute at issue in *Mac's Shell Service* was not the NJFPA, the court found that "both statutes share the same purpose of protecting franchisees from termination without cause." *Id.* at *8.  The court concluded that "constructive termination is part of traditional contract law principles, and requires that the franchisee no longer be operating the franchise." *Id.* at *8.  Thus, if the franchisee "is still in business, its constructive termination theory fails as a matter of law." *SAT Agiyar, LLC*, 2021 WL 5205941 at *6.  *But see Maintainco, Inc.,* 408 N.J. Super. at 478-79.[7]

Here, it is undisputed that Plaintiff was awarded the existing Newark Hotel license for "the 22-months remaining term." (SSOF ¶ 35; PRSOF ¶ 35). Despite Plaintiff representing Defendant's actions in securing the Ramada Hilton Inn as "a deliberately predatory business strategy" (Pl.'s Opp. at 40), it is undisputed that Plaintiff knew before, during, and after it entered the Franchise Agreement that Defendant was seeking a Holiday Inn® and a Holiday Inn Express® for the Newark Airport market.  (*See* SSOF ¶¶ 21, 23 - 24; PRSOF ¶¶ 21, 23-24).  Consequently, the record does not show Defendant intended "to cease doing business with" Plaintiff (*Fabbro*, 616

---

[7] *See* n.5, *infra*.

F.App'x at 490), rather that Moeckel continued communicating with Plaintiff in the hopes of maintaining their business relationship at the conclusion of the Franchise Agreement. *See* (SSOF ¶¶ 23-24; PRSOF ¶¶ 23-24) (Defendant's "intent [is] to work with" Batra "to provide" him "an option to evaluate conversion of the [Newark] [H]otel to a Holiday Inn Express and **work through replacement of the Holiday Inn brand elsewhere**.").

Defendant's interest in their business relationship beyond April 11, 2021, is further buttressed by additional evidence in the record. Defendant "offered" Plaintiff the "opportunity to convert the [Newark] Hotel from a Holiday Inn® to a Holiday Inn Express®" and emailed him a "proposal to convert the [Newark] Hotel to a Holiday Inn Express®." (SSOF ¶ 25; PRSOF ¶ 25). Approximately a month later, Moeckel inquired whether Batra was interested in the proposal, which Batra declined. (PSOF ¶ 23; DRSOF ¶ 23). Batra also rejected Moeckel's proposals in August and December 2019, to convert Newark Hotel to a Holiday Inn Express® or an Atwell Suites®. (SSOF ¶ 55; PRSOF ¶ 55).

Following approval of Plaintiff's license, Moeckel emailed Batra confirming Plaintiff is "not interested in a longer-term franchise for either the Holiday Inn or the Holiday Inn Express brand" and, once again, informed Batra that Defendant is "actively pursuing opportunities for long-term deals for both[,]" including "actively discussing the conversion of the Ramada Plaza" to a "Holiday Inn branded hotel." (SSOF ¶¶ 29, 31; PRSOF ¶¶ 29, 31). In response, Batra stated:

> I want you to understand that it's not as if I am not interested at all and instead, I want to take the time to sit down with you to have a conversation on a detailed scale."

(SSOF ¶ 32; PRSOF ¶ 32).

Here, assuming Plaintiff's allegations are true, Plaintiff has not alleged anything like the facts upon which *Maintainco, Inc.,* turned—that is Defendant's "conduct [here] was [not] [] geared

to forcing out [P]laintiff." 408 N.J. Super. at 475. Further, the record does not show Defendant intended to cease doing business with Plaintiff or to undermine the Newark Hotel to the benefit of another potential operator. Moreover, and most significant, Batra began negotiations with Hilton Worldwide on August 7, 2019, less than two months after signing his Holiday Inn® Franchise Agreement, and signed a Hampton Inn® Franchise Agreement five months before the expiration of Plaintiff's Holiday Inn® Franchise Agreement. (SSOF ¶ 38; PRSOF ¶ 38). Plaintiff's own actions are better evidence of constructive termination than those alleged as to Defendants. Accordingly, Count Two is dismissed with prejudice.

**C.**     **The Unreasonable Standards of Performance Claim (Count Three)**

Defendant argues Count Three fails as a matter of law because Plaintiff must show that Defendant "acted arbitrarily, in bad faith[,] and with an intent to impose economic ruin upon" Plaintiff. (Mem. of Law at 43). Plaintiff counters that issues of fact preclude summary judgment. (Pl.'s Opp. at 41). The Court disagrees and dismisses Count Three with prejudice.

Plaintiff alleges "Defendant's licensing of the Ramada Plaza as a full-service Holiday Inn and proposed licensing of the nearby Hampton Inn, have created conditions under which [Plaintiff] has been unable to operate profitably as any type of Holiday Inn[,]" which "constitute[s] the imposition of unreasonable standards. . . ." (Am. Compl. ¶ 26). Specifically, that Defendant "impose[d] unreasonable standards of performance upon" Plaintiff "by making it impossible for it to compete" by "placing" the Ramada Holiday Inn "in unreasonable proximity to" the Newark Hotel. (*Id.* ¶ 1). Like Plaintiff's constructive termination claim, however, the undisputed facts do not support the claim.

The NJFPA prohibits Defendant from "impos[ing] unreasonable standards of performance upon" Plaintiff. N.J.S.A. § 56:10-7(e). "The statute does not define unreasonable standards of

performance, and the New Jersey courts have not given much guidance." *Bank United, NA v. GC of Vineland, LLC*, No. 18-12879, 2024 WL 1299024, at *6 (D.N.J. Mar. 27, 2024) (internal quotation marks, ellipses, and citation omitted). As the NJFPA provides "no statutory definition for unreasonable standards of performance," courts describe "arbitrariness, bad intent or economic ruin as the hallmarks of an unreasonable standard of performance." *Ocean City Express Co., Inc.*, 194 F. Supp. 3d at 322 n.12 (internal quotation marks, brackets, ellipses, and citations omitted). Thus, Plaintiff "cannot succeed if" he does not provide "evidence of arbitrariness, bad intent, or economic ruin." *Bank United, NA*, 2024 WL 1299024, at *6 (citation omitted).

"When determining whether a defendant's actions were unreasonable, a court may consider the cumulative effect of multiple acts." *Bank United, NA*, 2024 WL 1299024, at *6 (citation omitted). "While any given action of [a] franchisor may not have violated this statutory prohibition[,] the cumulative effect [may] amount[] to imposing an unreasonable standard of performance." *S. Gas, Inc. v. ExxonMobil Oil Corp.*, No. 9-6236, 2016 WL 816748, at *7 (D.N.J. Feb. 29, 2016) (internal quotation marks, brackets, ellipses, and citation omitted).

Here, Plaintiff acknowledges that "arbitrariness, bad intent or economic ruin are the hallmarks of an unreasonable standard of performance," but nonetheless argues without citing authority that "subsequent cases make clear that bad faith is not required." (Pl.'s Opp. at 42) (internal quotation marks omitted). The Court finds that the record provides no evidence of arbitrariness, bad intent, and/or economic ruin, nevertheless.

Plaintiff lists a variety of disputed facts that purportedly create genuine issues of material fact as to arbitrariness, bad intent, and/or economic ruin, without citation to the record. (*Id.*). For example, while Plaintiff argues "Moeckel converted the" Ramada Holiday Inn "behind Batra's back" (*Id.* at 42), it is undisputed that after Plaintiff's franchise was approved, Moeckel informed

Batra that Defendant was "actively discussing the conversion of the Ramada Plaza" to a "Holiday Inn" hotel.  (SSOF ¶¶ 28-29, 31; PRSOF ¶¶ 28-29, 31).  Similarly, Plaintiff asserts that converting the Newark Hotel "resulted in a loss of revenue and profits to" Plaintiff (Pl.'s Opp. at 42), but the $8 million damage figure is disputed.  (PSOF ¶¶ 35, 42; DRSOF ¶¶ 35, 42).[8]  Batra also stated he "was unconcerned" when first learning of the Ramada Hilton Hotel (PSOF ¶ 27; DRSOF ¶ 27), further undermining the claim.  Thus, Plaintiff does not provide "examples as to how [Defendant] set" it up "for failure so that the Franchise Agreement[] could be terminated[.]" *See Dunkin' Donuts Inc. v. Dough Boy Mgmt., Inc.*, No. 2-243, 2006 WL 20521, at *11 (D.N.J. Jan. 3, 2006).

In drawing "every inference" in Plaintiff's favor, Defendant's conduct did not make Plaintiff's "business life sufficiently miserable" to allow this claim to proceed.  *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F. Supp. 637, 653 (1980).  Similarly, the evidence does not show that Defendant required Plaintiff "to operate at a substantial financial loss while" Defendant "implement[ed] a new and unproven market strategy, or set" Plaintiff "up for failure so that the" Franchise Agreement "could be terminated" (*Naik*, 2014 WL 3844792, at *14 (citation omitted)), both of which have been held unreasonable standards of performance.  Again, Plaintiff's own actions of entering into a conflicting franchise agreement with Hilton provided a basis for termination of the Holiday Inn franchise agreement.

Accordingly, because Plaintiff fails to "counter with specific facts which demonstrate that there exists a genuine issue" (*Orson, Inc.*, 79 F.3d at 1366 (citation omitted)), or "cite[] evidence in opposition to" Defendant's evidence (*Bank United, NA*, 2024 WL 1299024, at *15), Count Three is dismissed with prejudice.

---

[8] Plaintiff states that the cost of conversion to a Hilton hotel pursuant to the conflicting Hampton Inn® franchise agreement "was at least $8 million."  (PRSOF ¶ 38.).

### D.    <u>Damages Are Not Limited to "Fair Market Value" Under the NJFPA</u>[9]

Defendant argues damages are "limited to the difference between the reasonable value of the franchised business at the time of the nonrenewal less the reasonable value of the business without the wrongfully nonrenewed franchise." (Mem. of Law at 45) (citing *Westfield Centre Service, Inc. v. Cities Service Oil Co.*, 86 N.J. 453 (1981)); *see also Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 180 F.3d 542 (3d Cir. 1999)). Plaintiff counters that damages are not so limited. Pl.'s Opp. at 42-46). The Court agrees.

The NJFPA provides that a "franchisee may bring an action against its franchisor for violation" of the statute "to recover damages[,]" including costs and attorney's fees. N.J.S.A. § 56:10-10. The statute "specifies no particular measure for damages derived from violations of its provisions." *Ocean City Express Co.,* 194 F. Supp. 3d at 325. Such relief is "measured by [] the present value of lost future earnings or the present market value of the lost business, together with [] actual expenses derived from the termination." *Id.* (internal quotation marks and citations omitted). When "viewed in the light most favorable" to the non-moving party, however, "evidence on damages . . . suffices to create a triable issue on the question of damages." *Id.* at 329; *see also Mall Chevrolet, Inc. v. General Motors LLC,* No. 18-15077, 2021 WL 426193 at *17 (D.N.J. Feb. 8, 2021) (Granting summary judgment because plaintiff failed to provide damages evidence).

Here, the Court agrees that the holdings in *Westfield Centre Service, Inc.* and *Cooper Distrib. Co.,* do not limit Plaintiff to "fair market value" because "lost profits" are permitted under the Franchise Act and neither court barred such damages. (Pl.'s Opp. at 44). In *Cooper Distrib. Co., Inc*, the court held there is "no support . . . either in *Westfield* or elsewhere in New Jersey law" for the proposition that the NJFPA "implicitly forbids other measures" of damages outside of the

---

[9] For completeness, the Court addresses the parties' damages arguments despite dismissing with prejudice all three Counts of Plaintiff's Complaint with prejudice.

"fair market value of the franchise at the time of termination[.]" 180 F.3d at 548. The court further held that the *Westfield Centre Service, Inc.,* holding did not forbid damages sought in the form of "lost profits prior to termination." *Id.* at 548. Thus, "lost profits" are permitted under the NJFPA.

Accordingly, the Court finds that excess losses incurred because of nonrenewal and lost profits are cognizable under the NJFPA; and denies that portion of Defendant's seeking a limitation of damages. However, the Court further finds that Plaintiff has not only failed to support his claims but also failed to present evidence that he suffered damages. Based on the record, the damages alleged are not attributable to Defendant. Rather, the cost of conversion sought comes as a direct result of Plaintiff's obligations under the conflicting Hampton Inn® Franchise agreement. *See* (PRSOF ¶ 38.).

## IV.   **CONCLUSION**

For the reasons set forth above, Defendant's motion for summary judgment (ECF No. 51) is **GRANTED**, and Plaintiff's Amended Complaint (ECF No. 11) is **DISMISSED with prejudice**. The Clerk of Court shall **CLOSE** this matter. An appropriate Order accompanies this Opinion.

DATED: September <u>18</u>, 2024

HONORABLE JULIEN XAVIER NEALS
United States District Judge